OPINION
{¶ 1} On July 3, 2000, Berdell Bishop was indicted on a charge of felonious assault, in violation of R.C. 2903.11. Mr. Bishop entered a plea of "not guilty" at arraignment, and counsel was appointed to represent him. Later, Mr. Bishop retained counsel to defend him.
{¶ 2} Trial of Mr. Bishop's case was delayed because Mr. Bishop was imprisoned on other charges. Retained counsel withdrew and new counsel was appointed, which led to further delays. The second appointed counsel also withdrew, apparently after a trial was held, but the jury was unable to arrive at a verdict. New counsel was appointed to represent Mr. Bishop.
{¶ 3} The case proceeded to trial a second time, and Mr. Bishop was found guilty of aggravated assault, an offense of inferior degree. A sentencing hearing was conducted on April 17, 2002, and Mr. Bishop was sentenced to a term of incarceration of thirteen months, with fifty-one days of jail credit.
{¶ 4} The trial court appointed new counsel to represent Mr. Bishop on appeal, and a direct appeal has in fact been pursued. Three errors have been assigned for consideration:
{¶ 5} "First Assignment of Error
{¶ 6} "THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENT AGAINST THE DEFENDANT FOR THE INFERIOR OFFENSE OF AGGRAVATED ASSAULT WHEN THE MANIFEST WEIGHT OF THE EVIDENCE PROVES BY A PREPONDERANCE OF THE EVIDENCE THAT DEFENDANT-APPELLANT ACTED IN SELF-DEFENSE IN USING DEADLY FORCE AGAINST ANOTHER.
{¶ 7} "Second Assignment of Error
{¶ 8} "THE TRIAL COURT ERRED, DEPRIVING DEFENDANT-APPELLANT OF DUE PROCESS OF LAW UNDER THE FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES AND ARTICLE I, SECTION 10 OF THE CONSTITUTUION OF THE STATE OF OHIO, WHEN IT PERMITTED THE STATE TO INTRODUCE EVIDENCE OF DEFENDANT-APPELLANT'S LEGAL DISABILITY TO POSSESS OR OWN A FIREARM DUE TO A PRIOR FELONY DRUG CONVICTION.
{¶ 9} "Third Assignment of Error
{¶ 10} "HAVING PERMITTED THE STATE TO INTRODUCE EVIDENCE OF DEFENDANT-APPELLANT'S LEGAL DISABILITY TO POSSESS OR OWN A FIREARM DUE TO A PRIOR FELONY DRUG CONVICTION, THE TRIAL COURT ERRED, DEPRIVING DEFENDANT-APPELLANT OF DUE PROCESS OF LAW UNDER THE FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES AND ARTICLE I, SECTION 10 OF THE CONSTITUTION OF THE STATE OF OHIO, WHEN IT FAILED TO INSTRUCT THE JURY THAT DEFENDANT-APPELLANT MAINTAINED HIS CONSTITUTIONAL RIGHT TO SELF-DEFENSE IN SPITE OF THAT LEGAL DISABILITY."
{¶ 11} In the first assignment of error, counsel asserts that Mr. Bishop's conviction of aggravated assault was against the manifest weight of the evidence.
{¶ 12} In State v. Thompkins (1997), 78 Ohio St.3d 380, 387, the Supreme Court of Ohio reiterated the well-established standard of review for manifest weight claims:
{¶ 13} "* * * Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' (Emphasis added.) Black's * * * [Law Dictionary (6 Ed. 1990) 1433] * * * at 1594.
{¶ 14} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony. Tibbs * * * [v. Florida], 457 U.S. at 42 * * *. See, also, State v. Martin (1983),20 Ohio App.3d 172, 175 * * * (`The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.')."
{¶ 15} Counsel asserts that the evidence presented to the jury establishes as a fact that Berdell Bishop acted in self-defense when he shot Lonnie Benson. Because we find the evidence supports a finding that Mr. Bishop did not act in self-defense, we overrule this assignment of error.
{¶ 16} The first witness to testify at trial was Glen Bray, an officer with the Columbus Division of Police. Officer Bray was dispatched on May 29, 2000 as a result of a 911 call that an individual had been shot. Officer Bray found Mr. Bishop still at the scene of the shooting and still armed with a small caliber chrome handgun with a black handle. Later, Lonnie Benson was found in the area, bleeding from a gunshot wound to the neck.
{¶ 17} The second witness at trial was also a police officer, Charles M. Juris. Officer Juris was dispatched to 1493 South Champion Avenue on a report of a shooting. Officer Juris arrived at that address a few seconds before Officer Bray. Mr. Bishop acknowledged to Officer Juris that he had shot Lonnie Benson. Officer Juris recalled Mr. Bishop as saying, "he was giving me a bunch of shit and I don't take that from nobody." Officer Juris also recalled no statement from Mr. Bishop about a knife or other weapon.
{¶ 18} Columbus Police Officer Douglas E. White was the third witness at trial. Officer White was given a letter opener, which looked like a knife, by an occupant of 1493 South Champion Avenue on the day after the shooting. The letter opener had a point at the end and a serrated edge.
{¶ 19} Detective Brian J. Carney of the Columbus Division of Police was the next witness. Detective Carney was assigned to the assault squad in partnership with Detective Christopher Rond. The two detectives were assigned the responsibility of investigating the shooting at 1493 South Champion Avenue. They took pictures of the scene, including a picture of the letter opener.
{¶ 20} The two detectives later interviewed Mr. Bishop, who indicated that Lonnie Benson kept putting his (Mr. Benson's) hand behind his back. Mr. Bishop told police that he thought Lonnie Benson was reaching for a weapon.
{¶ 21} Detective Rond was called to the witness stand to identify a tape recording he made of an interview of Wanda Bishop, Mr. Bishop's wife. Detective Rond also testified that neither Wanda Bishop nor another witness, Charmyne Nixon, indicated that they saw Lonnie Benson with a weapon on the night in of the shooting.
{¶ 22} Charmyne Nixon testified that Lonnie Benson was her boyfriend. She also knew Wanda Bishop to be Lonnie Benson's niece. Charmyne and Lonnie got up a little before noon. Lonnie soon began drinking and had approximately three beers before he went over to Wanda Bishop's house. They found Wanda's door to have been kicked in and the battery cable to her car to have been cut. Wanda blamed Mr. Berdell for the damage.
{¶ 23} Wanda, Lonnie and Charmyne went to get a cable to repair Wanda's car, and Lonnie fixed the car once they returned to Wanda's home. Wanda was saying that she wanted a divorce from Mr. Bishop.
{¶ 24} Mr. Bishop called and talked to his wife. He indicated that he was returning to the house. When he returned, the women were inside the house, and Lonnie Benson was outside. The women left the house and could see Lonnie and Mr. Bishop arguing. Mr. Bishop wanted to go inside the house, and Lonnie did not want Mr. Bishop to go inside. Mr. Bishop talked to Wanda briefly and then the argument with Lonnie resumed. Charmyne estimated that the argument lasted thirty to forty-five minutes.
{¶ 25} Charmyne testified that Mr. Bishop started to leave but then turned around, walked over to Lonnie, and shot Lonnie. Charmyne testified that Lonnie was squarely facing Mr. Bishop and that Lonnie did not put his hands behind his back shortly before Mr. Bishop shot him.
{¶ 26} Lonnie Benson was the last witness for the state of Ohio. He testified that he had had one to two 24-ounce beers before he went over to Wanda Bishop's house at about 5:30 p.m. to visit. The battery cables on Wanda's car had been cut, so he fixed the cables. After repairing the car, Lonnie stayed to talk to Mr. Bishop when he arrived. Wanda had called Mr. Bishop and told him to come home.
{¶ 27} When Mr. Bishop arrived, Lonnie tried to introduce himself, but Mr. Bishop walked past him and approached Wanda.
{¶ 28} After Mr. Bishop and Wanda had a few words, Lonnie asked Mr. Bishop to leave. When Mr. Bishop refused to leave, Lonnie told Wanda to call the police, but she did not. Lonnie and Mr. Bishop then argued.
{¶ 29} Lonnie denied having any sort of weapon in his possession. Eventually, Mr. Bishop turned to walk away but then turned back, grabbed Lonnie, and shot him — according to Lonnie's testimony.
{¶ 30} Three witnesses testified during the defense case — Wanda Bishop, Laveril O. Lee and Mr. Bishop. Wanda Bishop recalled Lonnie Benson as being very upset when Mr. Bishop returned home, and she claimed Lonnie had earlier demanded she call Mr. Bishop to tell Mr. Bishop to come home. Wanda testified that Mr. Bishop and Lonnie had heated words and that Lonnie prevented Mr. Bishop from coming up onto the porch of the house. Wanda indicated that when Mr. Bishop approached Lonnie, Lonnie reached behind his body like he was getting something from his back pocket. Wanda did not see the actual shooting, but she heard the gun discharge.
{¶ 31} The second defense witness was Laveril O. Lee, a sister of Wanda Bishop. Laveril testified that Charmyne said Lonnie Benson was drunk on the day of the shooting.
{¶ 32} Mr. Bishop testified on his own behalf. He stated that he had had an argument with his wife, Wanda, and then had left the house. Mr. Bishop went to a friend's house, where Wanda called him and asked him to come back home. Mr. Bishop recalled Wanda as calling a second time and that Lonnie Benson got on the telephone. Lonnie was upset and kept telling Mr. Bishop that he (Lonnie) owned the house where Mr. Bishop lived. Mr. Bishop claimed that Lonnie threatened him.
{¶ 33} Mr. Bishop did not know Lonnie personally, but he claimed to know Lonnie's bad reputation.
{¶ 34} Mr. Bishop testified that Lonnie confronted him when he returned to the house. Lonnie blocked his entrance to the house and kept reaching behind his body into or toward his back pocket. Mr. Bishop claimed to be afraid that Lonnie was reaching for a weapon and had intended to do him harm, so he shot Lonnie.
{¶ 35} On cross-examination, the prosecution played a videotape of a statement Mr. Bishop gave to the police on May 29, 2000, which included an acknowledgement that Wanda and Mr. Bishop were separating or "splitting up."
{¶ 36} Summarizing the testimony as a whole, the jury was presented with two very different versions of what happened immediately before the shooting. Charmyne and Lonnie portrayed Mr. Bishop as a hostile aggressor who shot an unarmed Lonnie. Mr. Bishop and Wanda portrayed Lonnie as an enraged relative who kept threatening Mr. Bishop and who led Mr. Bishop to believe he (Lonnie) was armed. The jury was in the best position to weigh the conflicting testimony and in the best position to say whether Mr. Bishop had proved self-defense. The evidence in the record supports the jury's verdict, especially given the testimony of Officer Jervis that Mr. Bishop initially claimed anger as the motive for the shooting, not self-defense.
{¶ 37} The first assignment of error is overruled.
{¶ 38} In the second assignment of error, counsel for Mr. Bishop alleges that the trial court erred when it allowed the jury to become aware of Mr. Bishop's legal disability with respect to owning a firearm. Mr. Bishop testified that he deliberately went to his garage to arm himself immediately before confronting Lonnie Benson. This testimony harmed the credibility of Mr. Bishop that he was not in the least at fault for the fact that the confrontation occurred. Mr. Bishop knew he was not supposed to possess or use a firearm, yet he chose to arm himself rather than wait for a later time when both his temper and Lonnie Benson's temper had cooled.
{¶ 39} The trial court was well within its discretion to allow the testimony about Mr. Bishop's legal disability under the circumstances.
{¶ 40} The second assignment of error is overruled.
{¶ 41} The third assignment of error asserts that the trial court, having allowed the jury to become aware of Mr. Bishop's disability, erred in failing to specifically charge the jury that Mr. Bishop still had the right to defend himself.
{¶ 42} The trial judge expressly charged the jury about the law of self-defense. Nothing the judge said implied that Mr. Bishop did not have the right to defend himself the same as any other citizen of Ohio. The requested charge risked confusing the jury about the significance of Mr. Bishop's legal disability. The standard charge regarding self-defense was sufficient.
{¶ 43} The third assignment of error is overruled.
{¶ 44} All three assignments of error having been overruled, the judgment of the trial court is affirmed.
Judgment affirmed.
LAZARUS and BROWN, JJ., concur.